1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

9  SCOTT RAY EMERSON,                          CV F   04-5088 AWI DLB HC

10                          Petitioner,        FINDINGS AND RECOMMENDATIONS
                                               REGARDING PETITION FOR WRIT OF
11          v.                                 HABEAS CORPUS

12                                             [Doc. 1]
     JAMES A. YATES, Warden,
13
                            Respondent.
14  _____/

15
16          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

17  to 28 U.S.C. § 2254. Petitioner is represented by Victor Haltom, Esq.

18                                      BACKGROUND

19          On August 13, 1998, the district attorney filed information number 22701 in the Merced

20  County Superior Court, charging Petitioner with, in count 1, murder (Ca. Penal Code, § 187);[1] in

21  count 2, gross vehicular manslaughter while intoxicated (§ 191.5); in count 3, felony driving

22  under the influence with injury (Ca. Veh. Code, § 23153, subd. (a)); in count 4, possession of

23  drug paraphernalia (Health & Saf. Code, § 11364); and in count 5, driving with a suspended

24  license[2] (Ca. Veh. Code, § 14601.1).  (CT 115-118.)  As to count 3, the information alleged three

25  multiple victim enhancements (Ca. Veh. Code, § 12183).  (CT 116.)  The information further

26  _____

27          [1] All further statutory references are to the California Penal Code unless otherwise noted.

28          [2] This count additionally alleged that Petitioner had suffered six prior convictions for driving with a
     suspended license.

alleged that counts 2 and 3 constituted serious felonies within the meaning of sections 667 and 1192.7. (Id.)

On September 29, 1998, Petitioner waived his right to a jury trial. (CT 150.) Following a court trial on November 4 through 5, 1998, the court found Petitioner guilty as charged. (CT 335-336.)

On December 16, 1998, the court sentenced Petitioner to an aggregate term of twenty-one years to life in prison, calculated as follows: fifteen years to life for second degree murder (§ 187); three years for felony driving under the influence with injury (Ca. Veh. Code, § 23153, subd. (a)), with an additional three years for the three multiple victim enhancements (Ca. Veh. Code, § 23182); ten years for gross vehicular manslaughter while intoxicated (Ca. Veh. Code, § 23140), stayed pursuant to section 654; a concurrent six-month sentence for possession of drug paraphernalia (Ca. Health & Saf. Code, § 11364); and a concurrent one-year sentence for driving with a suspended license (Veh. Code, § 14601.1). (CT 375-378.)

On March 29, 2000, the California Court of Appeal affirmed the judgment, with the exception of vacating Petitioner's conviction for gross vehicular manslaughter, and striking one of the multiple victim enhancements. As a result, Petitioner's term was reduced to twenty years to life in prison. (Lodged Doc. 1.)

On April 18, 2000, Petitioner filed a petition for review in the California Supreme Court, which was denied on June 14, 2000. (Lodged Doc. 2.)

On October 18, 2000, Petitioner filed a petition for writ of habeas corpus in the Merced County Superior Court. The petition was denied on November 15, 2000.

On or around March 15, 2001, Petitioner filed a second petition for writ of habeas corpus in the Merced County Superior Court. The Merced County District Attorney filed a response. (Lodged Doc. 4.) On November 5, 2001, the petition was denied. (Court Doc. 38.)

On April 12, 2002, Petitioner filed a third petition for writ of habeas corpus. On this same date, the Merced County Superior Court denied the petition. (Exhibit D, attached to Respondent's Motion to Dismiss, Court Doc. 8.)

On May 15, 2002, Petitioner filed a petition for writ of habeas corpus in the Fifth District

1 | Court of Appeal, which was denied on June 13, 2002. (Id., Exhibit E.)

2 |      On December 12, 2002, Petitioner filed a petition for writ of habeas corpus in the

3 | California Supreme Court, which was denied in October of 2003. (Lodged Doc. 3.)

4 |      On December 19, 2003, Petitioner filed the instant federal petition for writ of habeas

5 | corpus. Respondent filed an answer to the petition on August 4, 2005, and Petitioner filed a

6 | traverse on September 12, 2005.

7 | STATEMENT OF FACTS[3]

8 |      On March 27, 1998, [Petitioner] was driving on Highway 99 while under
the influence of methamphetamine. He traversed the median, drove into
9 | oncoming traffic, and collided with two vehicles. Killed in the collision was 22-
year old Christopher Owens and injured were three German tourists, the Winters.

10 |

11 | I.    **PROSECUTION TESTIMONY**

12 |      Shortly after 2:00 p.m. on March 27, 1998, Kenneth Ohleyer was driving
in the fast lane on Highway 99 in the area of Worden Road when he saw in his
13 | rear view mirror [Petitioner's] black pickup approaching behind him. When
Ohleyer moved into the slow lane, [Petitioner] passed him, pulled into the slow
14 | lane, then twice crossed the fog line on the right side of the slow lane and
returned back to the center of the lane. The third time [Petitioner] crossed the fog
15 | line, he overcorrected, crossed over the grassy center divide and drove directly
into oncoming traffic. Ohleyer saw what looked like an explosion. He
16 | immediately slowed and pulled to the right while his passenger called 911.[4]

17 |      Tom Valles also observed [Petitioner] approaching behind him. Valles
moved into the slow lane, then [Petitioner] passed his car and pulled into the slow
18 | lane in front of him. Valles saw [Petitioner] straddle the fog line for a few
hundred feet. Valles passed [Petitioner] at approximately 70 miles per hour and
19 | returned to the slow lane. [Petitioner] then pulled into the fast lane and passed
Valles. [Petitioner] looked at Valles as he passed, revved his motor, and "took
20 | off" at approximately 90 miles per hour. As Valles watched [Petitioner's] pickup,
he saw it straddle the fog line, shoot across the fast lane and center divider and
21 | into oncoming southbound traffic. The pickup collided with two vehicles, one
containing three people, the other containing one.

22 |      The parties stipulated that, if called as a witness at trial, forensic
pathologist James A. Wilkerson would have testified consistently with his two-
page final pathological diagnosis of the cause of death of Owens, whose car was
hit by [Petitioner's] vehicle.

23 |      California Highway Patrol (CHP) Officer Lawrence Gale investigated the
collisions. He testified that [Petitioner's] pickup sustained major front-end
24 | damage, as well as a side impact at the driver's door. The two other vehicles, a
Pontiac and a white Plymouth, both suffered major front-end damage. Gale
25 | estimated that [Petitioner's] pickup was traveling at a speed of 62 miles per hour

26 |

27 |    [3] The Court finds the Court of Appeal correctly summarized the facts in its March 29, 2000 opinion. Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

28 |    [4] Ohleyer's passenger's testimony was consistent with Ohleyer's.

when it crossed into oncoming traffic.  Gale did not see any evidence that [Petitioner] had applied his brakes when he crossed the median.

CHP Officer Mike Colodeizey inspected [Petitioner's] pickup following the collision and determined the tires and brakes were in good condition.

CHP Officer Sean Hart contacted [Petitioner] in the hospital emergency room.  At 8:20 p.m., Hart directed hospital personnel to draw a blood sample from [Petitioner].  Hart also received a glass pipe that hospital personnel had found in [Petitioner's] pocket while he was in the emergency room.

The parties stipulated that an initial scraping of a substance found on the glass pipe tested positive for methamphetamine.  They further stipulated that additional scrapings sent to the Department of Justice were found to contain 0.01 grams of methamphetamine.

CHP Officer Jesse Diaz described the glass pipe as the type commonly utilized by drug users to smoke methamphetamine.  He explained that drug users place the methamphetamine, in rock form, into one end of the pipe, burn it with a match, and inhale the smoke.

Forensic toxicologist Kenji Ota testified that [Petitioner's] blood sample contained methamphetamine (350 nanograms per milliliter) and amphetamine.[5] Ota stated that [Petitioner's] blood contained the amount of methamphetamine found in the blood of a person abusing the drug.  Ota observed that [Petitioner's] blood pressure and heart rate in the emergency room remained high for quite a long time, a finding consistent with methamphetamine use.  These facts, and [Petitioner's] erratic driving and possession of the glass pipe, led Ota to conclude [Petitioner] was driving under the influence of methamphetamine.

On cross-examination, Ota admitted it was possible [Petitioner] was coming down off a methamphetamine high and was falling asleep at the time he crossed the center divide and drove into oncoming traffic.  However, he observed that [Petitioner] was awake prior to being med-flighted to the hospital.  Ota testified that, even if [Petitioner] had been falling asleep at the time of the collisions, he would still have been under the influence of methamphetamine and his driving would have been impaired as a direct result of his use of methamphetamine.  Ota also believed that, because a methamphetamine user would have to use a fair amount of methamphetamine to get to the point where he or she would suddenly "crash" or fall into a heavy sleep while driving, the user would be aware that a "crash" potentially could occur.

On March 29, 1998, CHP Officer Michael Morris advised [Petitioner] of his rights at the hospital.  At first, [Petitioner] did not say anything, but then he told Morris, "'Just tell them I didn't do any stuff that day.  I was clean.'"  When Morris asked [Petitioner] what he meant, he said, "'Just tell them I'm sorry.  I didn't mean to kill anyone.  I hadn't done any dope for two days.'"

On April 2, 1998, CHP Officer Gerald Elrod contacted [Petitioner] at the hospital. [Petitioner] agreed to talk with Elrod. [Petitioner] told him that on the morning of March 17, 1998, he had changed the oil in his pickup.  He drove to a friend's house and watched a movie.  Then he and his friend decided to drive to Modesto to pick up one of [Petitioner's] trailers so [Petitioner] could haul some walnut burl. [Petitioner] left for his father's house to pick up some burls. [Petitioner] and his friend drove separately toward Modesto on Highway 99.  At some point, the two stopped to get gas; [Petitioner] also bought a burrito, some potatoes, and milk.  The two friends continued driving toward Modesto. [Petitioner] told Elrod he was driving 65 to 70 miles per hour, and as fast as 80 miles per hour at times.

[Petitioner] admitted his driver's license was suspended and that he had a

---

[5] [Petitioner's] blood also contained mendazaline, a pharmaceutical related to Valium often given in emergency rooms.

4

prior DUI conviction.  He told Elrod he had been ordered to attend a DUI class, but had failed to finish it.  He said he was aware of the consequences of driving under the influence of drugs, stating: "'I'm fully aware of the consequences of doing that.  It's a bad thing.  I do drugs sometimes but I never drive.'"  He stated that he had lost a cousin in a DUI accident.

[Petitioner] explained he was eating when the collisions occurred.  He believed he was rear-ended by another vehicle and lost control as a result.  He denied using drugs on the day of the accident and claimed he had not used drugs since a few days before the incident, at which time he had ingested alcohol and snorted two lines of cocaine.

CHP officer Shane McConnell also investigated the collisions and viewed the three vehicles.  He testified that [Petitioner] committed multiple traffic violations, including exceeding the basic speed law (Veh. Code, § 22349, subd. (a)), making unsafe lane changes (Veh. Code, § 21658, subd. (a)), failing to maintain the right half of the roadway (Veh. Code, § 21650), cutting through the center median (Veh. Code, § 21460, subd. (a)), and tailgating (Veh. Code, § 21703).  Based on these violations and the additional information he obtained during his investigation, McConnell believed [Petitioner] directly caused the collisions as a result of driving recklessly while under the influence of methamphetamine.

McConnell also confirmed that [Petitioner's] cousin had died as a result of a fatal collision involving alcohol.

## II.    DEFENSE TESTIMONY

[Petitioner] testified on his own behalf.  He stated that two days prior to the accident he had taken some drugs.  However, he did not feel as if he were under the influence of those drugs on the day of the collisions.  He only felt tired.  He remembered thinking he would stop in Merced to wait for his friend and tell him he was too tired to drive.  [Petitioner] did not remember falling asleep, driving off the roadway, or colliding with any other vehicles.  The last thing he remembered was driving down Highway 99 and eating his lunch.  He testified he had been driving to Modesto to pick up some walnut burls and another man who worked for him was in another truck driving behind him.

On cross-examination, [Petitioner] acknowledged that his statements to the police regarding the events of the day in question had been accurate.  He denied knowing that injury or death could be consequences of driving under the influence of drugs.  He said that if he had known something like that was going to happen, he never would have driven that day.  He admitted he was aware others had died as a result of drivers who were under the influence of alcohol or drugs.

[Petitioner] denied owning the glass pipe that was found in his clothes.  He believed the pipe might have been in the truck when he bought it.  He denied ever smoking methamphetamine, but admitted he had snorted it.  He explained that two days before the collisions, he snorted what he believed was cocaine, but the drug must have been methamphetamine.  He stated he had used methamphetamine quite a bit during the time period proceeding the collisions.  He admitted he had prior convictions for being under the influence of methamphetamine, receiving stolen property, and grand theft.

(Lodged Doc. 1; Opinion, at 3-8.)

///

///

5

1 DISCUSSION

2 A.   Jurisdiction

3        Relief by way of a petition for writ of habeas corpus extends to a person in custody

4 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7 violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8 out of the Merced County Superior Court, which is located within the jurisdiction of this Court.

9 28 U.S.C. § 2254(a); 2241(d).

10        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12 enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

13 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

14 Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

15 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17 petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18 B.   Standard of Review

19        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20 custody pursuant to the judgment of a State court only on the ground that he is in custody in

21 violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22        The AEDPA altered the standard of review that a federal habeas court must apply with

23 respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

24 Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

25 will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

26 to, or involved an unreasonable application of, clearly established Federal law, as determined by

27 the Supreme Court of the United States;" or "resulted in a decision that was based on an

28 unreasonable determination of the facts in light of the evidence presented in the State Court

6

1  proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

2  the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

3  Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

4  because that court concludes in its independent judgment that the relevant state-court decision

5  applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

6  omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

7       While habeas corpus relief is an important instrument to assure that individuals are

8  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

9  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

10  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

11  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

12  factual determinations must be presumed correct, and the federal court must accept all factual

13  findings made by the state court unless the petitioner can rebut "the presumption of correctness

14  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

15  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

16  110 F.3d 1380, 1388 (9th Cir. 1997).

17  C.    Ineffective Assistance of Counsel Claims

18       In the instant petition, Petitioner raises several claims of ineffective assistance of counsel.

19  Specifically, Petitioner sets forth twelve different instances in which he claims defense counsel

20  was ineffective.  The Court will address each claim separately.

21       Petitioner raised these claims to the California Supreme Court, which issued a summary

22  denial.  The court looks to the last reasoned state court decision as to the basis for the state court

23  judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002) (citing Ylst v. Nunnemaker, 501

24  U.S. 797, 803-04 (1991)).  Where, as here, the state court reaches a decision on the merits but

25  provides no reasoning to support its conclusion, a federal habeas court independently reviews the

26  record to determine whether habeas corpus relief is available under section 2254(d).  Delgado v.

27  Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

28       The law governing ineffective assistance of counsel claims is clearly established for the

1  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

2  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

3  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

4  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

5  the petitioner must show that counsel's performance was deficient, requiring a showing that

6  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

7  the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

8  representation fell below an objective standard of reasonableness, and must identify counsel's

9  alleged acts or omissions that were not the result of reasonable professional judgment

10  considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

11  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

12  a strong presumption that counsel's conduct falls within the wide range of reasonable

13  professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

14  Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

15      Second, the petitioner must show that counsel's errors were so egregious as to deprive

16  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

17  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

18  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

19  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

20  was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

21  (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

22  have been different.

23      A court need not determine whether counsel's performance was deficient before

24  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

25  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

26  prejudice, any deficiency that does not result in prejudice must necessarily fail.

27      Ineffective assistance of counsel claims are analyzed under the "unreasonable

28  application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

1058, 1062 (2000).

    1.   <u>Failure to Investigate and Present Exculpatory Evidence</u>

Petitioner contends that trial counsel failed to investigate and present potential exculpatory evidence showing the victim was very likely killed by another vehicle and not by Petitioner's vehicle. (Petition, at 14.) Specifically, Petitioner argues that counsel did not conduct an adequate investigation by neglecting to hire an accident reconstruction expert to examine the crime scene or the prosecution's evidence. (Petition, at 15-16.) Petitioner further claims, "Had trial counsel conducted any investigation he would have discovered the potential exculpatory evidence of the third vehicle that very likely caused the fatal injury to the victim, because the prosecution's evidence shows that the third vehicle rear-ended the victim's vehicle after petitioner's vehicle hit the victim's vehicle (CT 23-24)." (<u>Id</u>.)

Despite Petitioner's claim that counsel should have hired and presented an accident reconstruction expert, Petitioner has not attached a declaration from such an expert or made any showing of what opinion a reconstruction expert would have rendered that would have aided in Petitioner's case. <u>See</u> <u>Wildman v. Johnson</u>, 261 F.3d 832, 839 (9th Cir. 2001) (mere speculation about what expert might say is not sufficient.) To the contrary, the evidence presented at trial established that Petitioner, while driving northbound on Highway 99, crossed the center median and drove head-on into the vehicle driven by the victim Christopher Owens. (RT 32, 53-54.) Eye Witnesses Kenneth Ohleyer, Judy Ortiz and Tom Valles all testified that they saw Petitioner's vehicle driving northbound on Highway 99, cross over the fog line on the right side of the slow lane, overcorrect and cross over the center divider heading directly into oncoming southbound traffic. (RT 28-32, 39-40, 49; <u>see also</u> CT 29-30.)

CHP Officer Lawrence Gale measured the tire friction marks from where Petitioner drove his vehicle across the freeway, and found no evidence of Petitioner having used his brakes. (RT 111, 116.) It was estimated that Petitioner was traveling at a speed of 60 miles an hour. (RT 115-116.) The CHP report written by Officer McConnell, stated that Petitioner's vehicle spun clockwise around the victim (Owen's) vehicle. Andrea Winter was following behind Owen's vehicle, and was immediately confronted with and collided with Petitioner's vehicle, she braked

1   abruptly but struck Petitioner's vehicle broadside.  (CT 29-30.)

2       Thus, this evidence amply establishes that Petitioner's vehicle, and not Andrea Winter's

3   vehicle, was the cause of the collision as he had crossed the center lane and drove into oncoming

4   traffic.  Accordingly, there is simply no merit to Petitioner's theory that defense counsel should

5   have investigated that a third vehicle was the cause of the collision.

6       Petitioner also contends that counsel failed to compel discovery from the prosecution

7   regarding whether Officer McConnel had any citizen's complaints for falsifying police reports or

8   any other complaints that would effect his credibility.  (Petition, at 16.)

9       Pursuant to Pitchess v. Superior Court, 11 Cal.3d 531 (1971), in certain circumstances,

10  the defendant may compel discovery of an officer's personnel files, including citizen complaints.

11  Here, however, there is nothing in the record to demonstrate that Petitioner's counsel failure to

12  seek such discovery fell below an objective standard of reasonableness.  To the contrary, there is

13  no evidence that defense counsel had any knowledge of what was in Officer McConnell's

14  personnel records.  Simply stated, Petitioner has failed to met his burden under Strickland, that is

15  that counsel's conduct fell below an objective standard of reasonableness or that had counsel

16  filed such a motion, there is a reasonable probability that the outcome of the case would have

17  been different.  Petitioner's claim is meritless.

18      Lastly, with regard to Petitioner's claim that counsel was ineffective for failing to make a

19  discovery motion to obtain scientific analysis as to a blood or alcohol test, Petitioner has failed to

20  offer any proof to substantiate his claim that this testing would have shown that his blood and/or

21  drug usage was not to the level alleged by the prosecution.  (Petition, at 16.)  Petitioner's claim is

22  nothing more than a vague unsubstantiated allegation, which is insufficient to warrant habeas

23  relief.  See Coleman v. McCormick, 874 F.2d 1280, 1284 (9th Cir. 1989) (en banc).

24      2.   Failure to Bring a Motion to Suppress Evidence

25      Petitioner next claims that trial counsel failed to make a motion to suppress evidence

26  obtained by Officer Hart.  (Petition, at 17.)  Petitioner contends that Officer Hart lacked probable

27  cause to arrest him for being under the influence of a controlled substance because he utilized the

28  medical blood analysis that was done at the hospital which was protected by disclosure of state

10

1   and federal law, particularly the physician-patient privilege.  (Id.)

2           a.      State Court Record

3           At trial, Officer Hart testified that on March 27, 1998, he went to Memorial North

4   Hospital in Modesto, California, to investigate a traffic collision. (RT 60.)  He made contact with

5   Petitioner in the emergency room, at approximately 5:00 p.m.. (RT 61-62.)  In response to the

6   question as to whether he "cause[d] a blood sample to be drawn from [Petitioner]," he stated

7   "yes" at approximately 8:20 p.m.  (Id.) The blood test was performed by a nurse.[6]  (RT 62.)

8   Officer Hart then stated that he retrieved some money and a "glass sloped object" from medical

9   personnel that was found with Petitioner.[7]  (RT 63-64.)  It was stipulated that the there was an

10  initial scraping of the pipe which tested positive for methamphetamine, and the Department of

11  Justice testings established that the scraping contained .01 grams of methamphetamine.  (RT 65-

12  66.)

13          In his answer, as previously stated, Respondent cites to Officer McConnell's police report

14  which states:

15          P-1 [Petitioner] was immediately transported to Memorial Hospital in
        Modesto.  Officer Hart #14906 responded to Memorial North Hospital in Modesto

16      to conduct follow up on the traffic collision.  Upon Officer Hart's arrival at the
        hospital, he was made aware of a cylindrical object (pipe) that was in P-1's

17      possession while at the hospital. The pipe was determined to be the type used to
        smoke amphetamines or similar types of drugs.  Emerson was sedated for medical

18      treatment and was unable to provide a statement.  A medical blood analysis was

19  _____

20      [6] It was stipulated that the blood was drawn in a medically approved manner and the chain of custody was
    proper.  (RT 62-63.)

21

22      [7] In a supplemental police report, Officer Hart he

23          waited for a blood draw to be taken from [Petitioner] as the medical personnel performed
        a CAT scan and several X-rays.  While waiting in the emergency room, [he] was notified that

24      Manuel Keaton (Trauma Team, Clinical Nurse II) had found [a] clear glass cylindrical object on
        the back board of [Petitioner] when he arrived at the emergency room.

25          Manual related that he contacted [Petitioner] as he was laying in a supine position and the
        clear glass cylindrical object was laying on his left side on the background.  Due to the nature of

26      the collision, the severity of the injuries of the parties involved and the discovery of the clear glass
        cylindrical object.  I placed John [sic] under arrest for 23153(a) V.C.-Driving under the influence

27      of drugs or alcohol.  A blood sample was drawn from the top of [Petitioner's] right hand by Molly
        Allison, Registered Nurse at 2020 hours.  Due to the extent [of] [Petitioner's] injuries, this was the
        only test available.

28  (CT 34.)

1

> done at the hospital.  The results indicated that Emerson had amphetamines in his system.  Based on the pipe the nature of the collision, the erratic driving of Emerson, and the medical blood analysis indicating the presence of amphetamines in Emerson's system, Officer Hart formed the opinion that Emergson was under the influence of drugs.  Officer Hart placed Emerson under arrest for driving under the influence of drugs. . . .

2

3

4

(CT 30.)

5

At trial, Officer McConnell testified that on March 27, 1998, he responded to the scene of

6

the collision.  (RT 142.)  He made contact with several of the witnesses at the scene.  (RT 143-

7

145.)  Based on his investigation at the scene of the incident, he opined that the cause of the

8

collision resulted

9

> From the erratic driving that proceeded northbound from 99 and then the accident itself, and the pipe found in his possession and the medical analysis from the hospital, I determined that the defendant was under the influence of drugs at the time of the collision.

10

11

12

(RT 145.)

13

In a declaration submitted to the state court, dated August 30, 2001, Officer McConnell

14

stated the following:

15

> When I was investigating this case, I did become aware that some unidentified medical personnel at Memorial Hospital had voluntarily disclosed that Petitioner, while being treated at the hospital, had undergone a preliminary screen medical blood analysis test which showed positive for methamphetamine. I also knew, as I had written in my report, that the record of this preliminary screen medical blood analysis test including its result was retained by Memorial Hospital and was not given or taken by myself or any other officer of the California Highway Patrol during the investigation of this case.
> I received no information that the actual blood sample taken by medical personnel which was used in the aforementioned preliminary screen medical blood test was retained by hospital personnel.  I also did not receive any information as to the identity of the hospital personnel who took that blood sample or the circumstances under which that sample was taken.

16

17

18

19

20

21

22

(Lodged Doc. 4, Exhibit 1; Declaration of Officer Shane McConnell, at 3-4.)

23

On December 14, 2006, the undersigned found that the *trial record* was lacking of

24

competent evidence for this Court to make a determination as to whether Officer Hart had

25

probable cause to warrant the ordering of a blood test.  Specifically, it was unclear what evidence

26

Officer Hart used to establish probable cause in making a determination to order medical

27

personnel to draw blood testing.   Therefore, on the basis of good cause, the undersigned ordered

28

an evidentiary hearing to be conducted addressing this single claim.  (Court Doc. 39.)

b.    <u>Evidentiary Hearing</u>

The evidentiary hearing was conducted on July 25, 2007.  The Court heard testimony from  California Highway Patrol Officers Shane McConnell and Sean Hart.  The following is a summary of the testimony presented at the hearing.

Officer McConnell testified that on March 27, 1998, he responded to the scene of a traffic collision that occurred on Highway 99, just south of the City of Merced.  (7/25/97 RT 6.)  When he arrived at the scene he observed that three vehicles had collided blocking the lanes of traffic and emergency personnel were on the scene.  (<u>Id</u>. at 7.)  The vehicles were located in the southbound lane of Highway 99.  (<u>Id</u>. at 8.)

Officer McConnell discovered that Petitioner was the driver and sole occupant of the GMC pickup.  (7/25/07 RT 9-10.)  McConnell observed that the pickup sustained major front-end damage.  (<u>Id</u>. at 12.)

McConnell spoke to a few witnesses at the scene of the collision.  (7/25/07 RT 13.)  He recalled speaking with Mr. Mesa, an off-duty highway patrol officer who had witnessed the collision.  (<u>Id</u>. at 13.)  He indicated that he was traveling southbound on Highway 99 in the number 2 lane, which was the slow lane adjacent to the Pontiac Grand Am.  (<u>Id</u>. at 13-14.)  As he was passing the Grand Am, he observed the GMC pickup cross over the center divider and collide head-on into the Pontiac.  (<u>Id</u>.)  He immediately pulled off the road and rendered aid to the victims.  (<u>Id</u>.)

After observing the scene and speaking with other officers present, Officer McConnell opined that as Petitioner was driving the GMC pickup in an erratic manner, he lost control of the vehicle when he passed over the center divider causing the head-on collision.  (7/25/07 RT 14.)

Officer McConnell's investigation of the collision was limited to the accident scene; he never went to the hospital where the blood was taken.  (7/25/07 RT 16.)

On the afternoon of March 27, 1998, Officer Sean Hart received a dispatch of an injury accident in the vicinity of Highway 99 and Merced County.  (7/25/07 RT 36.)  Prior to receiving this dispatch, he received a dispatch directing officers to be on the lookout for a vehicle driving in a reckless manner.  (<u>Id</u>.)  Officer Hart never responded to the scene of the accident.  (<u>Id</u>.)

Through dispatch, Officer Hart was informed that Petitioner was the driver of the GMC pickup that had caused the collision and who had previously been driving recklessly.  (7/25/07 RT 37.)

Officer Hart was instructed to respond to Memorial North Hospital in Modesto, and he arrived there at approximately 5 p.m.  (7/25/07 RT 37.)  Upon arrival at the hospital, Officer Hart made contact with Petitioner who was unconscious in the emergency room, where he was being attended to by medical personnel.  (Id. at 37-38.)  At this time, medical staff were preparing Petitioner to process and move him into the x-ray room.  (Id. at 38.)  While he waited nearby, a nurse showed him an "eight-and-a-half-by-11 sheet of paper on a clipboard that showed an initial blood draw", which indicated the blood contained amphetamines.  (Id.)

After Petitioner had been taken into the x-ray room, Officer Hart was notified by nurse Manuel Keaton that a glass methamphetamine pipe was located on the backboard of Petitioner's left side as they took him out of the helicopter.  (7/25/07 RT 39.)

Officer Hart waited for approximately over three hours while Petitioner was being treated by hospital staff.  (7/25/07 RT 44.)  During this time he telephone his sergeant and learned additional information about the collision.  (Id. at 56.)  Specifically, he learned that Petitioner had driven across the center divider causing the head-on collision into another vehicle, resulting in a fatality.  (Id. at 56-58.)  Based on Petitioner's erratic driving causing the fatality collision, the methamphetamine pipe found on Petitioner after the collision, and the fact that his blood tested positive for methamphetamine, Officer Hart determined that Petitioner had been driving under the influence of methamphetamine.  (Id. at 41.)  As a result, Officer Hart believed there was probable cause to arrest Petitioner for felony DUI causing injury.  (Id.)

Officer Hart explained that he was not able to arrest Petitioner until 8:15 p.m., after Petitioner's condition had been stabilized.  (7/25/07 RT 41-42.)  Although Petitioner was unconscious, Officer Hart placed him under arrest for violating California Vehicle Code section 23153.  He then directed a nurse to perform a legal blood draw, who took three vials of blood from Petitioner.  (Id. at 42-43.)  Officer Hart explained the additional blood draw was necessary to establish a chain of custody with respect to the preliminary screen, and due to privacy laws, he

1  felt that he would not be able to lawfully obtain the initial blood screen or results that had been

2  obtained by the hospital.  (Id. at 43.)

3                    c.      Analysis of Claim

4        The Fourth Amendment protects individuals against unreasonable searches and seizures.

5  A blood test constitutes a search of the person within the meaning of the Fourth Amendment.

6  Schmerber v. California, 384 U.S. 757, 768 (1966).  In Schmerber v. California, 384 U.S. 757,

7  767 (1966), the Supreme Court found that blood tests constitute a "search and seizure" under the

8  Fourth Amendment.  The Schmerber Court held that it did not violate the Fourth Amendment for

9  the police, upon probable cause but absent a warrant, to test a blood sample drawn from a

10  hospitalized DUI, suspect who had declined to take a breathalyser test and did not consent to a

11  blood test.  Id. at 772; see also United States v. Chapel, 55 F.3d 1416, 1419 (9th Cir. 1995)

12  (holding that under the Fourth Amendment, "before a law enforcement officer may lawfully take

13  a blood sample without consent or a warrant, he or she must have probable cause to believe that

14  the suspect has committed an offense which the current state of one's blood will constitute

15  evidence.").  Probable cause is found when the facts and circumstances known to the arresting

16  officer are sufficient to warrant a prudent person to believe that the person arrested has

17  committed or was committing an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964); see also Barry

18  v. Fowler, 902 F.2d 770, 772 (9th Cir. 1990).

19        In Schmerber, the Supreme Court reasoned that the officer requesting the blood sample

20  from the DUI suspect "might reasonably have believed that he was confronted with an

21  emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened

22  the 'destruction of evidence.'" Schmerber, 384 U.S. at 770, citation omitted.  The Court noted

23  that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the

24  body functions to eliminate it from the system.  Id. at 770-771.  The Court pointed out:

25              Particularly in a case such as this, where time had to be taken to bring the
              accused to a hospital and to investigate the scene of the accident, there was no
26              time to seek out a magistrate and secure a warrant.  Given these special facts, we
              conclude that the attempt to secure evidence of blood-alcohol content in this case
27              was an appropriate incident to petitioner's arrest.

28  Id. at 771.

1   It was also determined that the blood test chosen in Schmerber to measure the DUI

2   suspect's blood-alcohol was reasonable:

3          Extraction of blood samples for testing is a highly effective means of
       determining the degree to which a person is under the influence of alcohol.  See
4      Breithaupt v. Abram, 352 U.S. [432], at 436, n. 3, 77 S.Ct. at 410, 1 L.Ed.2d 448
       [1957].  Such tests are a commonplace in these days of periodic physical
5      examination and experience with them teaches that the quantity of blood extracted
       is minimal, and that for most people the procedure involves virtually no risk,
6      trauma, or pain.

7   Schmerber, 384 U.S. at 771.  Finally, the Schmerber Court found that the record showed that the

8   test was performed in a reasonable manner and according to accepted medical practices.  Id.

9   In order to determine whether Petitioner's counsel's decision was reasonable, the Court

10  must examine the strength of a motion to suppress on the bases alleged by Petitioner.  See

11  Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999).  Specifically, in order to demonstrate

12  prejudice, Petitioner must demonstrate that (1) had his counsel filed the motion, it is reasonable

13  that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is

14  reasonable that there would have been an outcome more favorable to Petitioner.  Id.

15  Under Schmerber, Officer Hart's actions in arresting Petitioner for DUI with injury, and

16  subsequent blood sample, were reasonable and did not violate Petitioner's Fourth Amendment

17  rights.  Officer Hart clearly had probable cause to arrest Petitioner for DUI based on the

18  information he obtained from his sergeant that Petitioner had engaged in erratic driving and

19  caused the head-on collision that resulted in a fatality.  Morever, he had knowledge that the

20  initial preliminary screen of Petitioner's blood tested positive for amphetamines and a glass pipe

21  commonly used to smoke methamphetamine had been found on Petitioner following the

22  collision.  (7/25/07 RT 38-39, 56.)  This information clearly supported Officer Hart's

23  determination that there was probable cause to arrest Petitioner for DUI with injury.  The

24  subsequent blood draw was authorized pursuant to Petitioner's arrest.

25  In addition exigent circumstances existed to obtain a blood sample from Petitioner.  At

26  trial, forensic toxicologist Kenji Ota explained that the amount of methamphetamine in one's

27  system decreases over time.  (RT 80.)  In addition, Ota opined that the level of methamphetamine

28  in Petitioner's body could have been twice the level that was he found in Petitioner's blood at the

1   time of the collision six hours earlier.  (RT 81.)

2         Accordingly, based on the foregoing, Officer Hart acted properly in arresting Petitioner

3   and obtaining the blood sample, and defense counsel was not ineffective for failing to bring a

4   motion to suppress this evidence.  James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994); see also Shah v.

5   United States, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal

6   argument does not constitute ineffective assistance of counsel.") (quotation marks and citation

7   omitted.)

8         3.   Failure to Bring a Motion to Suppress Petitioner's Statements

9         Petitioner argues that trial counsel was ineffective in failing to make a motion to suppress

10   his statements to law enforcement.  (Petition, at 20.)  Petitioner contends that "because of his

11   numerous injuries, brain damage, pain medications, and police harassment and coercion to make

12   a statement," he did not exercise his free will to make a statement to the police.  (Id.)

13         The first statement was given to Officers on March 29, 1998.  The statement at issue

14   given by Petitioner is: "Tell them I didn't do any stuff, I was clean."  (RT 97-98.)  "I didn't mean

15   to kill anyone, I hadn't done dope for two days."  (RT 98.)

16         Respondent argues that because voluntarily gave his statement regarding his involvement

17   in the collision and did not invoke his Miranda rights, and therefore the statement was not

18   involuntary and properly admitted.

19         Petitioner's first statement was made on March 29, 1998, two days after the accident, and

20   although he was released from the ICU unit sometime that same day and was undergoing medical

21   care for his injuries, Petitioner has failed to demonstrate that his statement was rendered

22   involuntary due to his medical condition.  When Officer Morris visited Petitioner on March 29,

23   1998, and read him his Miranda rights, Petitioner did not answer him.  (RT 95-96.)  Then as

24   Officer Morris was leaving, Petitioner spontaneously stated, "Just tell them I didn't do any stuff,

25   I was clean."  (RT 97-98.)  When the officer asked what he was referring to, Petitioner stated

26   "Just tell them I'm sorry, I didn't mean to kill anyone, I hadn't done any dope for two days."  (RT

27   98.)  Petitioner has not submitted sufficient evidence demonstrating that Petitioner's medical

28   condition on March 29, 1998, in any way influenced or rendered involuntary his spontaneous

statement to Officer Morris.  To the contrary, Petitioner's statement regarding his culpability for the collision evidences a conscious of his surroundings and awareness of the events leading to the collision.

The second statement was given to Officers on April 2, 1998.  During this interview, Petitioner acknowledged that he had previously been convicted of driving under the influence and was sentenced to attend a D.U.I. class and he failed to finish the class.  As a result, he was sentenced to jail.  (RT 138.)  Petitioner told officers that his cousin had been killed in an accident involving a driver who was under the influence.  (Id.)  Petitioner further acknowledged that he aware of the consequences of driving under the influence.  (RT 139.)  Specifically, Petitioner told officers, "I'm fully aware of the consequences of doing that [driving under the influence].  It's a bad thing.  I do drugs sometimes but I never drive."  (Id.)  Petitioner stated that at the time of the collision he felt okay to drive, and denying having used any drugs that day, but acknowledged that he had used drugs a few days prior to the incident.  (RT 140.)

Officers McConnell and Elrod went to the hospital on April 2, 1998, prior to meeting with Petitioner, they spoke with the nurse on duty who advised them that Petitioner was conscious, alert and coherent and had been making phone calls.  (See Lodged Doc. 4, Exhibit 1, at 2.)

When the Officers made contact with Petitioner, they too opined that Petitioner was conscious, alert and coherent.  (Id.)  Petitioner began asking questions regarding the traffic collision.  (RT 132-133.)  Petitioner was then read his Miranda rights, in response he stated he understood and wished to speak with the officers.  (RT 131-132; Lodged Doc. 4, Exhibit 1, at 2.)

In his traverse, Petitioner argues that due his medical condition he was unable to give a voluntary statement to Officers.  Petitioner argues that the instant case is comparable to Mincy v. Arizona, 437 U.S. 385 (1978).

In Mincy, the defendant was questioned in an intensive care unit with a hip wound he sustained a couple hours before being questioned.  437 U.S. at 398.  Unlike Petitioner, Mincy could not talk and had to write down his answers to the officer's questions.  Again, unlike Petitioner, Mincy repeatedly asked the police to stop the interrogation, requested his lawyer,

stated he was in pain, slipped in and out of consciousness, and complained of being confused and unable to think clearly. Id. at 399-401.  To the contrary, Petitioner, according to the nurse and both officers, was conscious and alert, responsive to officers and agreed to questioning, and freely answered all of the officer's questions.  He never expressed a desire to cease the questioning, or stated that he was in pain, unconscious, or confused.  Thus, because the extreme facts presented in Mincy are clearly distinguishable from the instant case, Mincy is not controlling.

Although Petitioner states that his statement was involuntary because he had taken 148 milligrams of Morphine on April 2, 1998, from 12 a.m. to 9:30 p.m., Petitioner fails to demonstrate how the effect or amount of the medication, caused his statements to officers to be rendered involuntary and against his free will.  In fact, to the contrary, the evidence presented establishes that Petitioner was conscious and alert, and willingly answered the officer's questions.

4.    Failure to Present Evidence of Petitioner's Incompetence

Petitioner contends that trial counsel was ineffective in failing to present evidence that Petitioner was not competent to assist in his defense or to stand trial.  (Petition, at 23.)

The conviction of an accused person while he is legally incompetent violates due process. Pate v. Robinson, 383 U.S. 375, 378 (1966).  Competency requires that the defendant have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense."  Drope v. Missouri, 420 U.S. 162, 171 (1975). The due process clause requires a state trial court to inquire sua sponte into a defendant's competence if "'a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence.'"  Amaya-Ruiz v. Stewart, 121 F.3d 486, 489 (9th Cir. 1997) (citation omitted).  A bona fide doubt exists if there is "substantial evidence of incompetence, id., and evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.  Moore v. United States, 464 F.2d 663, 666 (9th Cir. 1972).

Several factors are relevant to determining whether a competency hearing is necessary, including evidence of a defendant's irrational behavior and historical conduct, his demeanor at

1  trial, and any prior medical opinion on competence to stand trial.  See Drope, 420 U.S. at 180-81;

2  Amaya-Ruiz, 121 F.3d at 489.  The trial court is required to hold a competency hearing only

3  where the record as a whole creates a genuine doubt about the defendant's competence to stand

4  trial.  Bassett v. McCarthy, 549 F.2d 616, 619 (9th Cir. 1977).

5          Here, Petitioner has not demonstrated, nor does the record establish, that he was

6  incompetent at the time of his preliminary hearing or trial, as to require counsel to present

7  evidence that Petitioner was incompetent to assist in his own defense or to stand trial.  (See e.g.

8  CT 44-113, Transcript Preliminary Hearing.)  At trial, Petitioner competently testified in his own

9  behalf, which greatly belies Petitioner's claim of incompetency.  (RT 151-169.)  Thus, the state

10  courts' determination of this issue was not contrary to, or an unreasonable application of, clearly

11  established Supreme Court precedent.

12          5.      Failure to Conduct Discovery or Interview Prosecution's Witnesses

13          Petitioner contends that counsel was ineffective in failing to conduct discovery or

14  interview any of the prosecution's witnesses.  (Petition, at 24.)  Petitioner claims that counsel

15  failed to discover any evidence that could be used to impeach the prosecution witnesses.

16  Petitioner also claims that counsel failed to request a conditional examination of Andrea Winters

17  and the individuals in her vehicle before they returned to Germany.  (Id.)  Lastly, Petitioner

18  contends that trial counsel did not discover from the prosecution what impeachment evidence it

19  was going to use against Petitioner.  (Id.)

20          As Respondent correctly argues, Petitioner was provided with discovery of his 1997

21  misdemeanor conviction for being under the influence of methamphetamine and was given

22  notice that he had been convicted of two felonies, grand theft and receiving stolen property prior

23  to his trial.  (Lodged Doc. 4, Exh. 7.)  Petitioner's other claims are meritless, Petitioner has failed

24  to demonstrate counsel's alleged ineffectiveness or that he prejudiced as a result.  Conclusory

25  allegations do not warrant habeas relief. See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995)

26  (holding that conclusory allegations made with no reference to the record or any document do not

27  merit habeas relief); see also United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987)

28  (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no

indication of what potential witnesses would have testified to).  Therefore, this claim is without

merit, and the state courts' determination of this issue was not contrary to, or an unreasonable

application of, clearly established Supreme Court precedent.

       6.    <u>Failure to be Present in Court</u>

     Petitioner contends that counsel was ineffective when he failed to be present in court at a

"critical stage" in the proceedings.  (Petition, at 24.)  Specifically, Petitioner contends that on

August 14, 1998, the date of his arraignment, defense counsel Mr. Heusdens was not present in

court to represent him.  As Respondent submits, the minute order for August 14, 1998, indicates

that Roland Howard was present in court appearing for Mr. Heusdens.  (Exhibit B, attached to

Petition.)

     At the August 14, 1998 arraignment, Petitioner was furnished with a copy of the

Information and he plead not guilty.  (CT 119.)  The case was set for a pretrial conference and a

jury trial.  (<u>Id</u>.)  Accordingly, Petitioner has not and cannot demonstrate any resulting prejudice

by the presence of Mr. Howard in the place of Mr. Heusdens.  Petitioner's claim fails on the

merits.

     With regard to Mr. Heusden's absence at the September 4, 1998, discovery hearing, the

record reveals that the prosecution's motion was brought pursuant to California Penal Code

section 1054.3.  This section entitles the prosecution to discovery from the defendant prior to

trial.  (CT 120-121.)  Thus, as Respondent correctly argues, the motion would have been granted

regardless even had Mr. Heusdens appeared and objected.  Petitioner presents no evidence

otherwise.  Although the court granted the prosecution's motion for discovery, it ordered that the

discovery compliance was to be mutual, thereby compelling the prosecution to also provide

discovery.  (CT 126.)

       7.    <u>Advice to Waive Right to Jury Trial</u>

      Petitioner next contends that defense counsel was ineffective when he advised him that if

he waived his right to a jury trial, he would receive less prison time as a result of a court trial.

(Petition, at 25.)  Petitioner contends that counsel informed him that if he waived his right to a

jury trial, he would only receive two to four years in prison.  Petitioner further argues that his

1   waiver was unknowing.  (Petition, at 25-26.)

2       The record in this case belies Petitioner's claim.  The trial court advised Petitioner of the

3   nature of a jury trial and of the consequences of waiving it.  Petitioner freely indicated his desire

4   to waive a jury trial.  (Lodged Doc. 4, Exh. 5.)  In a letter written to the trial court on December

5   26, 2000, Mr. Heusdens explained his tactical reasons for advising Petitioner to waive a jury trial.

6           I, James Heusdens, represented, [Petitioner], in the above-entitled matter.
7   After reviewing the evidence and the nature of the case, I met with [Petitioner] to
    discuss with him whether or not this case should be a jury trial or a trial by the
    court.  In view of the facts in the case, I felt that [Petitioner] had better prospects
8   of getting a fair trial if he had a court trial, rather than a trial by jury.  At the time
    of the incident, [Petitioner] had in his possession evidence of narcotic use.  That,
9   together with the facts of the case of there being the death of a young man, and
    severe injuries to others, created a highly charged emotional climate, giving me
10  concern that my client would be crucified in front of a jury.  In light of such an
    atmosphere, and due to all the emotions it engendered, I felt that [Petitioner's]
11  chance of receiving a fair and impartial trial by jury was not possible.

12          In my opinion, I thought that a judge would review the evidence in an
    unbiased manner and make his judgment based solely on the evidence.  As a
13  result, [Petitioner] chose to go ahead with a court trial, which was held in Merced
    County.  I believe that [Petitioner] had a decent case, and I believe that the
14  evidence in the case did not justify the conviction of a second-degree murder
    charge.

15  (Exhibit D, attached to Petition.)

16      Based on the facts and charges in this case, it is unreasonable for Petitioner to expect a

17  two to four year prison term if he waived a jury trial.   The main issue at trial was whether

18  Petitioner would be convicted of second degree murder as opposed to gross vehicular

19  manslaughter while intoxicated.  Petitioner was also charged with felonious driving under the

20  influence causing injury (Vehicle Code § 23153(a)), with enhancements pursuant to Vehicle

21  Code section 23182(a).  A conviction for gross vehicular manslaughter while intoxicated carries

22  a range of punishment of four, six, or eleven years.  A conviction for Vehicle Code section

23  23153(a), with two Vehicle Code section 23182(a) enhancements, exposed Petitioner to an

24  additional five years in prison.  (See Petitioner's driving record at CT 354-356.)  Based on the

25  substantial evidence and charges filed in this case, Petitioner's claim that he expected to receive a

26  sentence of two to four years is simply incredible and contrary to the record in this case.

27      Accordingly, because defense counsel had sound tactical reasons for advising Petitioner

28

to waive his right to a jury trial and Petitioner's claim of a two to four year sentence is incredible, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

8.    Failure to Challenge Admissibility of Prosecution's Evidence

Petitioner contends that counsel was ineffective in failing to challenge the admissibility of the prosecution's evidence. (Petition, at 26.) Petitioner raises several instances in which he believes counsel should have challenged the State's evidence at trial. The Court, as did Respondent, will address each claim separately.

First, Petitioner contends that counsel should not have stipulated that Debbie Owens, the victim's mother, was talking with her son at 2:14 p.m. on March 27, 1998, when the collision occurred. (See RT 17-18.) Petitioner argues that counsel should have objected on the ground that it was immaterial and irrelevant, as well as, misleading and highly prejudicial. (Petition, at 26.)

As Respondent correctly argues, the time of the traffic collision was relevant and probative. Forensic toxicologist Kenji Ota used this stipulated time of the traffic collision, along with the time the blood sample was drawn from Petitioner at the hospital (RT 61), to give an opinion as to the level of methamphetamine that was in Petitioner's system at the time of the collision. It was Ota's opinion that the level of methamphetamine in Petitioner's system at the time of driving would have been much higher than the actual level detected in the blood sample drawn approximately six hours after the collision. (RT 80-81.) By entering into the stipulation counsel avoided the victim's mother from having to give likely emotionally charged testimony regarding her last conversation with her son. Counsel had a valid tactical reason for the stipulation, and the evidence was clearly relevant.

Second, Petitioner contends that counsel was ineffective for failing to object to the glass pipe being admitted into evidence on the ground that there was a lack of adequate foundation. (Petition, at 26.) (See CT 335; RT 19-27, 63-64, 66-67, 124-127.) This contention lacks merit. Both trial witnesses Manuel Keaton and Officer Sean Hart testified as to how the pipe was found and collected. (See RT 19-21, 24-26, 63-64, 67.) Their testimony satisfied the foundational

23

1    requirements of California Evidence Code section 402, and any objection would have been futile.

2    Accordingly, Petitioner has failed to demonstrate ineffectiveness under <u>Strickland</u>.

3         Third, Petitioner argues that trial counsel erred by stipulating to the chain of custody for

4    the blood sample drawn from Petitioner.  (Petition, at 26.)  Petitioner's claim is unfounded.

5    Petitioner has not produced any evidence to demonstrate that the blood sample introduced at trial

6    (People's Exhibit No. 100) is not the blood sample drawn from Petitioner.  Nor has Petitioner

7    demonstrated that the blood sample was tampered or tainted.  Accordingly, Petitioner has simply

8    failed to demonstrate that the state courts' determination of this issue was not contrary to, or an

9    unreasonable application of, clearly established Supreme Court precedent.

10        Fourth, Petitioner contends that trial counsel erred in not objecting to Officer Diaz's

11   testimony on the ground that it was cumulative to the stipulation of the glass pipe testing positive

12   for methamphetamine.  (RT 68-73.)  At trial, counsel stipulated that the initial scraping of the

13   substance found on the pipe tested positive for methamphetamine, and was subsequently sent to

14   the Department of Justice and tested positive for .01 grams of methamphetamine.  (RT 65-66.)

15   During examination, Officer Diaz testified that the glass pipe is commonly used by drug users to

16   smoke methamphetamine.  (RT 69.)  He explained that the drug user places the

17   methamphetamine, which is in rock form, into one end of the glass pipe and then burns it with a

18   match and inhales the smoke in order to get a high.  (RT 70.)  Officer Diaz's description of the

19   use of the pipe was not cumulative of the stipulation regarding the testing procedure performed

20   on the pipe.  Counsel was not ineffective for failing to object to such testimony.

21        Fifth, Petitioner contends that trial counsel did not cross-examine Officer Michael Morris,

22   who testified that Petitioner told him, "Just tell them I didn't do any stuff that day.  I was clean.

23   Just tell them I'm sorry.  I didn't mean to kill anyone.  I hadn't done any dope for two days."

24   (Petition, at 26.)  Petitioner argues that

         had trial counsel cross-examined this witness, the trial court would have learned
25       that Petitioner exercised his right to remain silent, and any reasonable jurist would
         agree that the Edwards Rule is well known, where the trial court would have sua
26       sponte required the prosecution to show Petitioner's statements were voluntarily
         made and not obtained in violation of the Edwards Rule.
27

28   (Petition, at 27.)

24

In <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), the defendant voluntarily submitted to questioning, but later stated that he wished to have an attorney before the discussions continued. The following day, detectives approached the defendant in the county jail, and when he refused to speak with them, he was told that "he had" to talk.  The Supreme Court held that the subsequent incriminating statements made without the present of his attorney violated the defendant's rights under the Fifth And Fourteenth Amendments.  (<u>Id</u>. at 484-485.)

As previously stated, Officer Morris visited Petitioner at the hospital on March 29, 1998, and advised him of his Miranda rights.  (RT 95-97.)  After reading Petitioner his rights, Petitioner did not say anything.  (RT 97.)  However, when Officer Morris was on his way out of the hospital, Petitioner spontaneously remarked, "Just tell them I didn't do any stuff that day.  I was clean."  (RT 98.)  When Officer Morris asked Petitioner what he meant, Petitioner answered, "Just tell them I'm sorry.  I didn't mean to kill anyone.  I hadn't done any dope for two days." (<u>Id</u>.)

These facts establish that Petitioner made the above statements to Officer Morris on his own volition.  He never explicitly expressed his right to remain silent or requested an attorney to be present, and his statement was clearly voluntarily given to Officer Morris this case is distinguishable from <u>Edwards</u>.  Petitioner has not established how counsel's cross-examination of Officer Morris would have changed or demonstrated a reasonable likelihood that the result would have been different.  As such, the California Supreme's denial of this claim was a reasonable application of <u>Strickland</u>.

Sixth, Petitioner contends that counsel was ineffective for failing to adequately cross-examine the prosecution's accident expert.  (Petition, at 27.)  He argues "had trial counsel done so, the evidence would show that Petitioner lost control of his vehicle when he was on the fog line (or curb), and then shot across the median to cause the accident."  (<u>Id</u>.)

Petitioner's claim is conclusory in nature, as Petitioner fails to specify what questions counsel should have asked.  Nonetheless, during cross-examination of Officer Gale he did admit that Petitioner had most likely lost control of his vehicle when he crossed the median, as the officer agreed that no driver would intentionally cross from side of the freeway to the other.  (RT

119-120.)   The trial court also concurred with Officer Gale's statement, stating "I don't think anybody would drive across there on purpose." (RT 119.)  Moreover, witnesses Kenneth Ohleyer, Judy Ortiz and Tom Valles indicated that Petitioner's vehicle crossed the fog line, overcorrected, then crossed over the center divider and drove into oncoming southbound traffic. (RT 28-32, 39-40, 49.)  It appears that the point Petitioner claims counsel should have presented was already in evidence.

Next, Petitioner claims that counsel did not object to the introduction of the alleged prior convictions into evidence.  (Petition, at 27; see Exhibit F, attached to Petition; RT 120-121.)  As Respondent points out, the only prior convictions alleged in the information were the six prior convictions set forth in Count 5, charging Petitioner with driving on a suspended license. Petitioner fails to identify what legal ground should have been raised to exclude the prior convictions, or that such objection would have been meritorious.  In fact, under Vehicle Code section 14601, subdivisions (b) and (c), prior convictions for driving with a suspended license are relevant for enhancing the sentence on a subsequent violation.  Accordingly, Petitioner has failed to demonstrate the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Petitioner contends that counsel was ineffective for failing to object to the introduction of his medical records regarding the treatment he received as a result of the traffic collision, and the medical records of "the prosecution witnesses."

Initially, as Respondent points out, no medical records of prosecution witnesses who testified at trial were introduced into evidence.  The medical reports of Petitioner, Andrea Winter, Paul Winter, Drunhild Winter, and Christopher Owens were properly introduced pursuant to California Evidence Code section 1270, the business record exception to the hearsay rule.  Petitioner's claim that the records contain "improper medical opinion" is vague and conclusory and does not warrant habeas relief.  Specifically, Petitioner has failed to cite to the specific portion of those medical records that contain the "improper medical opinion."  As such, Petitioner's vague and conclusory allegation is insufficient to warrant habeas relief.  Jones, 66 F.3d at 205.

Petitioner's medical records had probative value as it established that he had a preliminary screen for the presence of methamphetamine, as well as high blood pressure and a high heart rate for a fair length of time. Prosecution witness Kenji Ota relied on these factors to support his opinion that Petitioner was driving under the influence of methamphetamine at the time of the collision. (See RT 77-79.)

The medical records of Andrea Winter, Paul Winter and Drunhild Winter were probative to prove the enhancements charging Petitioner with driving under the influence and causing injury to these individuals. In addition, the medical records of Christopher Owens established that a human being was killed (§ 187), Petitioner committed gross vehicular manslaughter (§ 191.5), and Owens suffered bodily injury (Cal. Veh. Code § 23153(a)). The medical records regarding the victim's cause of death were admissible as they were relevant and not prejudicial, because the cause of death was not in dispute. See People v. Beeler, 9 Cal.4th 953, 980-981 (1995).

Petitioner further contends that counsel was ineffective for failing to object to the introduction of a certified copy of a Department of Motor Vehicles ("DMV") abstract of Petitioner's driving record on the ground that it was cumulative to the prior convictions, irrelevant, and prejudicial. (Petition, at 27.) As Respondent correctly argues, the DMV records were introduced to establish that Petitioner's license had been suspended, and he had knowledge of this when he was driving his vehicle on March 27, 1998. The prosecution had to prove these two elements in order to find Petitioner guilty of Count 5 (Veh. Code § 14601.1; see CALJIC No. 16.640.) Therefore, the DMV records were undoubtedly relevant and were not cumulative as it established that Petitioner's license was suspended at the time of the collision.

Petitioner contends that counsel was ineffective in stipulating that Dr. Wilkerson is a licensed pathologist who would testify consistently with his findings in the pathology report. (Petition, at 27.) Petitioner's claim is meritless. As Respondent submits, had defense counsel not stipulated or objected to the stipulation, the People would have simply called Dr. Wilkerson as a witness and had him testify as to the autopsy performed and the victim's cause of death. Moreover, the cause of death was undisputed, and by entering into the stipulation counsel

1    reasonably avoided graphic live testimony as to the injuries the victim sustained as a result of the

2    collision.  Accordingly, Petitioner's claim is without merit and counsel was not ineffective and

3    Petitioner was not prejudiced.

4        Petitioner next argues that counsel was ineffective for failing to object to the testimony

5    given by Michael Walter's regarding the glass pipe (RT 124-127), on the ground that it was

6    cumulative to the testimony of witness Manuel Keaton.  Contrary to Petitioner's contention, the

7    evidence was not cumulative.  As evidenced by defense counsel's vigorous cross-examination of

8    Michael Keaton, his testimony was equivocal as to whether he actually observed the pipe on

9    Petitioner's person or merely on the gurney next to Petitioner's body.  (See RT 22-25.)  This fact

10   was important because in order to convict him of Count 4 (possession of controlled substance

11   paraphernalia) the prosecution had the burden of proving beyond a reasonable doubt that

12   Petitioner actually possessed the glass pipe.  Michael Walters, a flight paramedic, testified that he

13   arrived at the scene of the collision and transported Petitioner to Memorial Hospital.  (RT 124-

14   125.)  The pipe was found on Petitioner's person in his pants while the paramedics were

15   rendering aid in transport to the Hospital.  (RT 126-127.)  Walters stated that the glass pipe was

16   taken to the emergency room, and left with Petitioner in the same spot it was found.  (RT 126.)

17   Walters testimony therefore provided the necessary evidence to establish that Petitioner

18   possessed the glass pipe, and was not cumulative of Michael Keaton's equivocal testimony.

19   Accordingly, Petitioner's claim is without merit.

20       Next, Petitioner contends that counsel was ineffective for failing to cross-examine

21   prosecution witness Officer Mike Coldeizey, who testified that the brakes on Petitioner's truck

22   appeared to be in good condition.  (RT 129.)  Petitioner contends this testimony was inconsistent

23   with the report on the day of the collision, March 27, 1998, in which Coldeizey stated, "the

24   drums and shoes appeared in good condition except the front shoe of the right wheel was cracked

25   horizontally in three spots."  (CT 33.)  Petitioner argues that the cracks probably occurred when

26   he hit the fog line and lost control and shot across the median.  (Petition, at 28.)

27       As to the latter claim, it is purely speculative.  The record does not support Petitioner's

28   contention that hitting the fog line caused the three horizontal cracks on the front shoe of the

right rear wheel. In fact, officer Gale described the area to the right of the fog line as consisting of dirt and gravel. (RT 108.) Furthermore, Petitioner has not demonstrated that these cracks had any effect on the brakes. To the contrary, the evidence establishes that the brakes were in fact in good working condition on the day of the collision. (RT 129.) Moreover, whether the brakes were in good working condition on the day of the collision, was irrelevant to Petitioner's defense that he was falling asleep at the time of the collision. Petitioner has simply failed to demonstrate how counsel was ineffective in failing to cross-examine on this superficial point, or that he was prejudiced thereby.

Petitioner contends that trial counsel did not object to Petitioner's statement, introduced through prosecution witness Officer Elrod, on the ground that it was involuntary. Petitioner further contends that counsel failed to adequately cross-examine Officer Elrod. (See RT 140-141.)

On April 2, 1998, Officer Elrod, along with Officer McConnell, went to the Hospital to talk with Petitioner. (RT 130-131.) Officer McConnel read Petitioner his Miranda rights, and Petitioner freely stated that he would answer the questions. (RT 131-132.) Officer Elrod proceeded to question Petitioner regarding the events that transpired on the day of the collision. (RT 132-138.) Officer Elrod further questioned Petitioner regarding the consequences of driving while under the influence of alcohol or a controlled substance, to which Petitioner stated "that he was aware of what could happen. He brought up the fact that his cousin was killed in an accident involving a driver that was under the influence." (RT 139.) Specifically, Petitioner stated, "I'm fully aware of the consequences of doing that. It's a bad thing. I do drugs sometimes but I never drive." (RT 139.) Petitioner's voluntary statements were admissible at trial as a party admission (Ca. Evid. Code, § 1220), and counsel was not ineffective for failing to further cross-examine Officer Elrod.

Next, Petitioner contends that counsel was ineffective for failing to object to the prosecution's stipulation that Petitioner was ordered to go to a Diversion Class and did not go and went to County Jail instead. (See CT 336; RT 174-175.) Petitioner contends that this error was compounded

by the prejudicial error of trial counsel not objecting to the prosecution improperly impeaching petition with a "non-felony act," where he was under the influence of Methamphetamine, (Exhibit F, RT 164) because the trial court construed this "prior act" as driving under the influence to find that petitioner had actual awareness of the dangers of drinking and driving and to find petitioner guilty of Second Degree Murder and Gross Vehicular Manslaughter.  (Exhibit F, RT 186, 187; CT 336.)

Officer Elrod testified that Petitioner admitted to previously being convicted of driving under the influence.  Petitioner told Officer Elrod that he had been sentenced to attend a DUI class, but he had failed to complete the class.  As a result, the judge had sentenced Petitioner to jail.  (RT 138.)

When Petitioner took the stand, the prosecutor confronted him with the fact that he had been convicted of being under the influence of methamphetamine in 1997, approximately a year before the current trial.  (RT 164.)  The cross-examination went as follows:

Q.  Now, you've been convicted of being under the influence of crank before, haven't you?

A.  Once.

Q.  And that was in 1997, correct?

A.  No.  That was in '95, '95 or '96.

Q.  But you were convicted in '97?

A.  Yes.

Q.  Sometime after you were caught, correct?

A.  Yes.

Q.  And you admitted that you used crank then, correct?

A.  Yes.

Q.  So you know what it is?

A.  Yes.

(RT 164.)

As Respondent correctly argues, this cross-examination shows that the prosecutor questioned Petitioner about his prior conviction for being under the influence of crank or

methamphetamine to show that Petitioner had previously used the drug and was familiar with it. This evidence was also relevant to show that Petitioner had a prior history of using methamphetamine.  As Respondent submits, this evidence was also relevant to call into question Petitioner's claim that he had not taken any drugs before the collision, even though he had a pipe with methamphetamine residue in his pocket.  (See RT 162.)

Furthermore, at trial, Petitioner admitted that he had been a heavy user of methamphetamine prior to the collision.  (RT 166-167.)  Based on Petitioner's own admissions, he was not prejudiced by evidence that he a conviction for being under the influence of methamphetamine.  During his trial testimony, Petitioner also admitted that he was aware that individuals can die as a consequence of driving under the influence of drugs or alcohol.  (RT 160.)  Based on the trial record, Petitioner simply has not, and cannot show, that counsel's representation fell below an objective standard of reasonableness or that he was prejudiced by counsel's inactions.  Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

9.      Failure to Adequately Advise Petitioner Regarding Consequences of Testifying

Petitioner contends that counsel was ineffective for failing to adequately advise him of the consequences of testifying.  (Petition, at 29.)  Specifically, Petitioner contends that counsel did not advise him that by testifying he could incriminate himself, and the prosecution could impeach him with prior felony convictions of receiving stolen property, or for a misdemeanor under the influence conviction.  (Id.)

In the instant case, Petitioner's declaration indicates that he and defense counsel discussed whether Petitioner should testify, and it was agreed that Petitioner should take the stand because "it would look good" for his case.  (See Exhibit A, attached to Petition.)  Defense counsel had a valid tactical reason for advising Petitioner to testify.  Petitioner's defense at trial was that he accidentally fell asleep while driving, and he did not feel that he was under the influence of narcotics at the time.  Petitioner's testimony attempted to establish just that.  On direct examination, the following was elicited from Petitioner:

Q.  Did you, yourself, feel like you were under the influence on that day?

1
2
3
4
5
6
7
8
9
10
11
12
13
14

        A.  No.
        Q.  As you were driving north on Highway 99, did you–were you feeling
any different or unusual?
        A.  I was tired.
        Q.  You were tired?
        A.  (Witness nodding head up and down).
        Q.  How long had it been since you slept?
        A.  The night before.
        Q.  The night before.  And you were tired as you were driving up the
highway?
        A.  Yes.
        Q.  Do you remember falling asleep?
        A.  No.
        Q.  Do you remember going off the roadway?
        A.  No.
        Q.  Do you remember going across the roadway and then running into any
another [sic] vehicle?
        A.  No.
        Q.  All right.  What is the last thing you remember prior to the accident?
        A.  I remember driving down 99 and I was eating.
        Q.  Were you eating as you were driving?
        A.  Yes.
        Q.  And do you know whether you fell asleep or not?
        A.  No.
        Q.  So you can't tell us what was happening, how you went off the
roadway or anything like that you, if you did?
        A.  The last thing I remember I woke up in the hospital.

15  (RT 152-154.)

16  Petitioner's testimony attempted to establish that the collision was a horrific accident,

17  caused by Petitioner's sleepiness.  Thus, counsel had a reasonable tactical basis for advising

18  Petitioner to testify as his testimony was critical evidence necessary to his defense.

19  It is noteworthy that Petitioner's claim is strongly negated by his numerous encounters

20  with law enforcement and the legal system, in which Petitioner was advised of his right to remain

21  silent and his right against self-incrimination.

22  In any event, Petitioner has not shown that had he not testified there is a reasonable

23  probability that the outcome of his case would have been different.  Accordingly, the state courts'

24  determination of this issue was not contrary to, or an unreasonable application of, clearly

25  established Supreme Court precedent.

26       10.  Failure to Object to Impeachment of Petitioner

27  Petitioner contends that counsel was ineffective for failing to object to the prosecution

28  impeaching him with a misdemeanor conviction of being under the influence of drugs.  (Petition,

32

at 30.)  He contends that counsel could have objected under Evidence Code section 352 or on due process grounds.  (Id.)

Initially, Petitioner has failed to demonstrate that an objection under Evidence Code section 352 would have been successful, given the relevancy of the prior conviction of being under the influence of drugs.  Therefore, it is mere speculation that such an objection would have been successful, and Petitioner simply has not, and likely cannot, demonstrate that there is a reasonable probability that the result of the proceedings would have been different.  First, counsel was not ineffective in failing to object to the impeachment of Petitioner with the prior conviction as it was relevant to the instant offense, and any objection would have been futile.  See e.g. Jackson v. Calderon, 211 F.3d 1148, 1155 (9th Cir. 2000); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994); Lowry v. Lewis, 21 F.3d 344, 345 (9th Cir. 1994).  Second, as Respondent submits, as discussed above, Petitioner was not prejudiced by counsel's alleged inactions.  Thus, even assuming that counsel was somehow ineffective in failing to object to the impeachment, Petitioner's own trial testimony admitting that he was heavily using methamphetamine at the time prior to the collision, demonstrates that Petitioner was not prejudiced by admission of the prior conviction.

Petitioner continues to argue that had he not been impeached with the conviction, "the trial court would not have an adequate factual basis for finding petitioner had an actual awareness of the dangers of drinking and driving for the trial court to conclude petitioner was guilty of Second Degree Murder under *People v. Watson* (1981) 30 Cal.3d 290."  Petitioner's claim is meritless, as counsel was not ineffective for failing to object, nor was Petitioner prejudiced as he clearly testified at trial that he was aware of the lethal consequences of driving under the influence of drugs and he had a cousin who had been killed as a result of such an incident (RT 160), which amply supported the court's conclusion that Petitioner intentionally drove while under the influence of drugs, despite his awareness of the high risk of harm it involved to others.  (RT 186.)

///

///

11.   Failure to Object to Petitioner's Inability to Confront and Cross-Examine The Winters Witnesses

Petitioner contends that counsel was ineffective for failing to object to the absence of Andrea, Druhild and Paul Winter, thereby violating his right to confront and cross-examine.

As Respondent points out, Petitioner has failed again to demonstrate how the testimony of these witnesses would have helped his case.  To the contrary, it is highly probable that the witnesses testimony would have bolstered the prosecution's theory of the case.

Andrea Winter was interviewed by law enforcement and stated that as she was driving south on Highway 99 in the number one lane, she observed a traffic collision involving Christopher Owen's (the victim's) vehicle directly in front of her. (CT 28.)  Because it happened so quickly, she had no time to react and struck the vehicle in front of her. (Id.)  She believed she had struck Owen's car; however, the evidence established that she actually struck Petitioner's vehicle. (See CT 29-30.)  Based on the record in this case, there was no concrete evidence that Andrea Winters's vehicle caused the collision, rather the undisputed evidence established that Andrea Winters and the two passengers in her vehicle were victims of the collision caused by Petitioner crossing over the median into oncoming traffic.  Accordingly, Petitioner has failed to met his burden under Strickland, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

12.   Failure to Provide Adequate Representation

 Finally, Petitioner claims that counsel did not render effective representation due to his poor health.  Petitioner further contends that counsel had a conflict of interest in defending Petitioner because his wife was also killed by a drunk driver.  Lastly, Petitioner contends that counsel erroneously conceded the fact that Petitioner was guilty of gross vehicular manslaughter and driving under the influence of drugs with injuries. (Petition, at 32.)

As Respondent submits, Petitioner has made no showing that counsel's representation was affected by his poor health or that counsel had a conflict of interest.  Such vague unsubstantiated allegations are insufficient to warrant habeas relief, and Petitioner has simply failed to sustain his burden under Strickland.

34

Counsel reasonably made a tactical decision to concede that Petitioner was guilty of gross vehicular manslaughter and driving under the influence of drugs with injuries as the evidence strongly supported such charges, and argued vigorously against a finding of second degree murder.  See e.g. Strickland, 466 U.S. at 688-89 (great deference is owed to counsel's methods of case presentation and tactical decisions).

With regard to Petitioner's claim that cumulative error deprived him of his Sixth Amendment right to counsel, it is likewise without merit.  Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial.  See Ceja v. Stewart, 97 F.3d 1246, 1254 (9th Cir.1996).  Cumulative error will be found where "there are several substantial errors," and their cumulative effect is "so prejudicial as to require reversal."  Killian v. Poole 282 F.3d 1204, 1211 (9th Cir. 2002).  However, where there is no single constitutional error, there is nothing to accumulate to a level of a constitutional violation.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

No single error was made at Petitioner's trial that was sufficiently prejudicial on an individual basis so as to warrant relief.  Likewise, even considering the cumulative effect of each of Petitioner's allegations, this Court is not left with the impression that the errors were so prejudicial as to require reversal.  Petitioner's claim of cumulative error is without merit and must be denied.

D.    Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel did an unprofessional and prejudicial job that he was effectively denied of his Sixth Amendment right to counsel.[8]

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th

---

[8]  The Court notes that Respondent has failed to address Petitioner's ineffective assistance of appellate counsel and prosecutorial misconduct claims in his answer.  However, because there is no merits to these claims, and in the interest of justice, the Court will resolve them on the existing record before it, without the needless necessity of requiring Respondent to file a response to the claims.

Cir.1986); See also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54 (1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, she would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989).  Appealing every arguable issue would do disservice to the Petitioner because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. Id.  Appellate counsel has no constitutional duty to raise every nonfrivolous issue requested by petitioner. Id at 1434 n.10 (citing Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308 (1983)).

Because defense counsel was not deficient and there was no resulting prejudice, Petitioner has failed to demonstrate that, but for counsel's alleged deficiencies, there was a reasonable probability that he would have prevailed on appeal.  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Petitioner's claim is without merit and must be denied.

E.     Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct by violating his duty to prosecute Petitioner fairly when he "impugned the defense counsel's character and integrity by

inferring that defense counsel fabricated a defense, suborned perjury, and assumed that defense counsel did not believe his client." (Petition, at 48.) Petitioner merely cites to Exhibit F, in support of his claim. Exhibit F contains examination by both counsel of prosecution witnesses, and the Court's finding in rendering its verdict.

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see, Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)). Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different. To the contrary, an error is harmless if the court, after reviewing the entire trial record, decides that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

Petitioner's claim is nothing more than a vague unsubstantiated allegation devoid of specific factual support in the record. Conclusory allegations do not warrant habeas relief. See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory allegations made with no reference to the record or any document do not merit habeas relief). Although Petitioner cites to Exhibit F, he does not point to what in that Exhibit establishes that the prosecution committed misconduct. Further, the Court has reviewed the entire record in this case and does not find that the prosecutor engaged in misconduct so as to violate Petitioner's right to due process. Nor has Petitioner demonstrated or this Court found that even if such error occurred it had a "substantial and injurious effect or influence in determining the jury's verdict" so as to warrant reversal of Petitioner's conviction. Accordingly, Petitioner's claim is without merit.

///

1

## RECOMMENDATION

2       Based on the foregoing, it is HEREBY RECOMMENDED that:

3       1.      The instant petition for writ of habeas corpus be DENIED; and

4       2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

5       This Findings and Recommendation is submitted to the assigned United States District

6   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

7   the Local Rules of Practice for the United States District Court, Eastern District of California.

8   Within thirty (30) days after being served with a copy, any party may file written objections with

9   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

10  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

11  and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

12  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

13  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

14  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

15  Cir. 1991).

16      IT IS SO ORDERED.

17  **Dated:      October 30, 2007          _____/s/ Dennis L. Beck_____**
                                            UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28